**<u>EXHIBIT C</u>**

**Draft Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**LAST CALL GUARANTOR, LLC,**

**LAST CALL HOLDING CO. I, INC.,**

**LAST CALL HOLDING CO. II, INC.,**

**THE OTHER SELLERS NAMED HEREIN,**

**and**

**FUN EATS AND DRINKS LLC**

**September __, 2016**

8104105

# TABLE OF CONTENTS

**Page**

Article I Definitions ......................................................................................2

Article II Purchase and Sale...........................................................................13
    Section 2.1    Purchase and Sale of Acquired Assets......................................13
    Section 2.2    Excluded Assets ...............................................................16
    Section 2.3    Assumption of Assumed Liabilities .........................................17
    Section 2.4    Excluded Liabilities ...........................................................18
    Section 2.5    Consideration ..................................................................18
    Section 2.6    Assumption and Assignment of Contracts..................................18
    Section 2.7    Designation Rights.............................................................19
    Section 2.8    Closing .........................................................................21
    Section 2.9    Deliveries at Closing .........................................................22
    Section 2.10   Allocation ......................................................................23
    Section 2.11   Excluded Locations ...........................................................23
    Section 2.12   Deposit .........................................................................23

Article III Sellers' Representations and Warranties. ............................................23
    Section 3.1    Organization of Sellers; Good Standing ...................................24
    Section 3.2    Authorization of Transaction ...............................................24
    Section 3.3    Noncontravention; Consents and Approvals ..............................25
    Section 3.4    Compliance with Laws .......................................................25
    Section 3.5    Title to Acquired Assets......................................................25
    Section 3.6    Contracts .......................................................................25
    Section 3.7    Intellectual Property..........................................................26
    Section 3.8    Litigation .......................................................................26
    Section 3.9    Employees and Employment Matters ......................................26
    Section 3.10   Employee Benefit Plans.......................................................26
    Section 3.11   Real Property. ..................................................................27
    Section 3.12   Permits .........................................................................27
    Section 3.13   Brokers' Fees ..................................................................28
    Section 3.14   Taxes ...........................................................................28
    Section 3.15   No Other Representations or Warranties ..................................29

Article IV Buyer's Representations and Warranties...............................................30
    Section 4.1    Organization of Buyer........................................................30
    Section 4.2    Authorization of Transaction ...............................................30
    Section 4.3    Noncontravention..............................................................30
    Section 4.4    Financial Capacity ............................................................31
    Section 4.5    Adequate Assurances Regarding Executory Contracts....................31
    Section 4.6    Good Faith Purchaser.........................................................31

Section 4.7    Brokers' Fees ..................................................................31
Section 4.8    Condition of Business ......................................................31

Article V Pre-Closing Covenants.......................................................................32
Section 5.1    Certain Efforts; Cooperation ...........................................32
Section 5.2    Notices and Consents ......................................................32
Section 5.3    Bankruptcy Actions .........................................................33
Section 5.4    Conduct of Business ........................................................34
Section 5.5    Notice of Developments ..................................................35
Section 5.6    Access ..............................................................................35
Section 5.7    Press Releases and Public Announcements ......................35
Section 5.8    Bulk Transfer Laws..........................................................36
Section 5.9    Contracts ..........................................................................36

Article VI Other Covenants ...............................................................................37
Section 6.1    Cooperation ......................................................................37
Section 6.2    Further Assurances ...........................................................37
Section 6.3    Availability of Business Records......................................37
Section 6.4    Employee Matters .............................................................38
Section 6.5    Recording of Intellectual Property Assignments .............39
Section 6.6    Transfer Taxes ..................................................................39
Section 6.7    Wage Reporting ................................................................40
Section 6.8    Acknowledgements...........................................................40
Section 6.9    Insurance Policies ............................................................40
Section 6.10   Collection of Accounts Receivable...................................41
Section 6.11   Use of Name and Marks ...................................................41
Section 6.12   Liquor License Approvals.................................................41
Section 6.13   Data Privacy Protection ...................................................41
Section 6.14   Gift Cards .........................................................................42
Section 6.15   Name Change ....................................................................42
Section 6.16   Covenant Not to Sue ........................................................42

Article VII Conditions to Closing......................................................................43
Section 7.1    Conditions to Buyer's Obligations...................................43
Section 7.2    Conditions to Sellers' Obligations....................................44
Section 7.3    No Frustration of Closing Conditions...............................44

Article VIII Termination.....................................................................................45
Section 8.1    Termination of Agreement................................................45
Section 8.2    Procedure Upon Termination............................................46
Section 8.3    Effect of Termination ........................................................46
Section 8.4    Deposit. .............................................................................46

Article IX Miscellaneous...................................................................................47
Section 9.1    Expenses ...........................................................................47
Section 9.2    Entire Agreement..............................................................47
Section 9.3    Incorporation of Schedules, Exhibits and Disclosure Schedule ...............47

Section 9.4    Amendments and Waivers ................................................47
Section 9.5    Succession and Assignment ............................................47
Section 9.6    Notices .............................................................................48
Section 9.7    Governing Law; Jurisdiction...........................................49
Section 9.8    Consent to Service of Process.........................................49
Section 9.9    WAIVERS OF JURY TRIAL ..........................................49
Section 9.10   Severability .....................................................................49
Section 9.11   No Third Party Beneficiaries ..........................................49
Section 9.12   No Survival of Representations, Warranties and Agreements..................49
Section 9.13   Computation of Time.......................................................50
Section 9.14   Mutual Drafting ..............................................................50
Section 9.15   Disclosure Schedule........................................................50
Section 9.16   Headings; Table of Contents...........................................51
Section 9.17   Counterparts; Facsimile and Email Signatures ...............51
Section 9.18   Time of Essence ..............................................................51

Exhibit A      -      Form of Sale Order
Exhibit B      -      Form of Bill of Sale
Exhibit C      -      Form of Assignment and Assumption Agreement
Exhibit D      -      Form of Trademark Assignment Agreement
Exhibit E      -      Form of Copyright Assignment Agreement
Exhibit F      -      Form of Domain Name Assignment Agreement
Exhibit G      -      Form of Management Agreement
Exhibit H      -      DIP Schedule
Exhibit I      -      Form of Applicable Promissory Note

Schedule 2.3   -      Certain Assumed Liabilities

Disclosure Schedule

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended or modified, this "Agreement") is entered into as of September __, 2016, by and among Last Call Guarantor, LLC ("Guarantor"), Last Call Holding Co. I, Inc., a Delaware corporation ("Holding I"), Last Call Holding Co. II, Inc., a Delaware corporation ("Holding II"), Last Call Operating Co. I, Inc., a Delaware corporation ("Operating I"), Last Call Operating Co. II, Inc., a Delaware corporation ("Operating II"), F&H Restaurants IP, Inc., a Delaware corporation ("F&H IP"), Champps Restaurants IP, Inc., a Delaware corporation ("Champps IP"), KS Last Call, Inc., a Kansas corporation ("KS Last Call"), and MD Last Call, Inc., a Maryland corporation ("MD Last Call," and together with Guarantor, Holding I, Holding II, Operating I, Operating II, F&H IP, Champps IP, KS Last Call and MD Last Call, "Sellers," and each individually, a "Seller"), and Fun Eats and Drinks LLC, a Wyoming limited liability company (individually and not in its capacity as a lender or agent and together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, Sellers are debtors and debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in jointly administered bankruptcy cases under Chapter 11 of the Bankruptcy Code captioned *In re Last Call Guarantor, LLC, et al., Case No. 16-11844 (KG)* (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court")[1];

WHEREAS, Sellers are engaged in the business of operating casual dining restaurants under the Fox and Hound, Bailey's Sports Grille and Champps trade names (the "Business");

WHEREAS, Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as of the Closing;

WHEREAS, Seller intends to seek the entry of an order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, pursuant to the Bid Procedures Order, the Sellers conducted an Auction to determine the highest and best offer for the Acquired Assets; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

---

[1] The debtors in the Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Last Call Guarantor, LLC, Last Call Holding Co. I, Inc. (3962), Last Call Holding Co. II, Inc. (8727), Last Call Operating Co I., Inc. (3541), Last Call Operating Co II., Inc. (8272), F&H Restaurants IP, Inc. (0107), Champps Restaurants IP, Inc. (3776), KS Last Call Inc. (1480), and MD Last Call Inc. (9190). The Debtors' business address is 19111 Dallas Pkwy, Unit 370, Dallas, TX 75287.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"503(b)(9) Claims" means any claims against the Sellers under 11 U.S.C. § 503(b)(9) timely filed and served pursuant to the Order Granting Motion of the Debtors for Entry of an Order (I) Fixing a Deadline and Establishing Procedures for Filing Requests for Allowance of (A) Administrative Claims Under 11 U.S.C. § 503(b)(9) and (B) Statutory Trust Claims Pursuant to the Perishable Agricultural Commodities Act and Packers and Stockyards Act of 1921; (II) Approving the Form, Manner, and Sufficiency of Notice Thereof and (III) Granting Related Relief [Docket No. 172] in the Chapter 11 Cases.

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Acquired Assets" means all of Sellers' right, title and interest in and to all of Sellers' properties, assets and rights of every nature, kind and description, tangible and intangible, whether real, personal or mixed, whether accrued, contingent or otherwise, wherever situated or located, existing as of the Closing, including all rights to bring claims for past, present or future infringement of the Intellectual Property owned by Sellers; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Acquired Assets shall not include any Excluded Assets.

"Acquired Avoidance Actions" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code relating to the Business and the Acquired Assets.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Applicable Preferred Units" means non-voting, "Class B" preferred units of the Buyer, with a call price and a liquidation preference equal to the consideration set forth in Section 2.5(f) plus applicable accrued dividends, referenced in such Section 2.5(f).

"Applicable Promissory Note" means that certain unsecured, subordinated promissory note in substantially the form attached as Exhibit I.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.9(a)ii.

"Assumed Contract List" has the meaning set forth in Section 2.6(a).

"Assumed Contracts" means those Leases and other Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.6 (or, as applicable, Section 2.7) and section 365 of the Bankruptcy Code.  For the avoidance of doubt, "Assumed Contracts" shall not include any Non-Real Property Contract or Lease that is excluded and rejected pursuant to Section 2.6 (or, as applicable, Section 2.7).

"Assumed Liabilities" means solely those liabilities and obligations enumerated on Schedule 2.3 attached hereto.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms, but excluding all Permits to the extent solely related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Assumption Approval" has the meaning set forth in Section 2.6(c).

"Auction" means the auction for the sale and assumption of the Acquired Assets and Assumed Liabilities conducted by Sellers.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Procedures Order" means that certain Order (A) Approving Bid Procedures Relating To The Sale Of All Or Substantially All Of The Assets Of The Debtors, (B) Establishing Procedures In Connection With The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (C) Approving Notice Procedures, And (D) Granting Related Relief [Docket No. 183] entered in the Chapter 11 Cases

"Bill of Sale" has the meaning set forth in Section 2.9(a)i.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in Dallas, Texas shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Cash Payment" has the meaning set forth in Section 2.5(a).

"Champps IP" has the meaning set forth in the preamble.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

3

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Confidentiality Agreement" means that confidentiality agreement dated August 29, 2016, by and among Holding I, Holding II, and Buyer, regarding the terms and conditions on which Sellers would make available certain information.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Acquired Assets, including the assumption, assignment and sale by Sellers to Buyer, and the acceptance by Buyer, of the Assumed Contracts and Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Related Agreements.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts, as such store locations may be changed in accordance with Section 2.6(a) or 2.7.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding including, without limitation, the Franchise Agreements and the Prior Management Agreements.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Bid" has the meaning set forth in Section 2.5(b).

"Credit Card Receivables" means all accounts receivable and other amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers that are made with credit cards or any other amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

4

"Cure Amounts" has the meaning set forth in Section 2.6(b).

"Cure Notice" has the meaning set forth in Section 5.3(b).

"Current Employees" means all employees of Sellers employed immediately prior to the discharge of employees required by the first sentence of Section 6.4(a) below, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" has the meaning set forth in Section 2.12.

"Deposit Amount" means an amount equal to 10% of the aggregate Purchase Price described in Section 2.5.

"Designation Rights Asset" has the meaning set forth in Section 2.7.

"Designation Rights Period" means the period commencing on the Closing Date and ending 90 days after the Closing Date, provided that such period may be extended at the Buyer's option for up to 120 additional days in accordance with the requirements of Section 365(d)(4) of the Bankruptcy Code.

"DIP Agreement" means that certain Debtor-in-Possession Credit Agreement, by and among Guarantor, the other borrowers thereto and Buyer (as the post-petition lender), governing the terms of the DIP Facility, as amended or modified.

"DIP Amount" means all amounts that, as of the Closing Date, have been advanced to Sellers under the DIP Facility.

"DIP Facility" means the debtor-in-possession financing facility under the DIP Agreement.

"DIP Schedule" means the schedule attached hereto as Exhibit H, setting forth the categories of expenses and estimated amounts associated with such categories that would be incurred by Sellers, for the period from August 31, 2016 through November 1, 2016.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or for which any Seller may have liability as being an ERISA Affiliate, or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"End Date" means such date as (w) the conditions to Closing in Section 7.2 have been satisfied, (x) Buyer has delivered or is ready to deliver the items described in Section 2.9(b), (y) the forms of Management Agreement and Transition Services Agreement (if applicable) have been agreed to and (z) Buyer has indicated to Sellers its willingness to close the Contemplated Transactions and, to the extent not then satisfied, to allow the Sellers' deliveries described in clause (v) of Section 2.9(a) to be delivered post-Closing.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Seller within the meaning of Section 414(b) or (c) of the IRC (and Sections 414(m) and (o) of the IRC for purposes of provisions relating to Section 412 of the Code).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" has the meaning set forth in Section 2.6(a).

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against third parties to the extent related to any Excluded Asset or Excluded Liability.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Stores" means any restaurant location that is the subject of *Motion Of The Debtors For Entry Of An Order (I) Authorizing The Debtors To Reject Certain Commercial Leases Nunc Pro Tunc, (II) Establishing Procedures For The Rejection Of Executory Contracts And Unexpired Leases Of Nonresidential Real Property And (III) Granting Related Relief* [Dkt. No. 161] or any store location listed on Schedule 2.2(i).

"Excluded Taxes" means any and all (i) Taxes of any Sellers or their Affiliates;  (ii) Taxes imposed on or arising in connection with the Business or Acquired Assets for any Pre-Closing Tax Period or allocable or apportioned to the portion of a Straddle Period ending on the Closing Date as provided herein (provided that Taxes attributable to periods after the Petition Date shall either be paid under the DIP Agreement in accordance with the amounts set forth on the DIP Schedule or shall be treated as Assumed Liabilities pursuant to Schedule 2.3); (iii) Taxes arising from a breach of covenant of, agreement, representation or warranty of any Seller in this Agreement; and (iv) all Taxes arising from any bulk sale provisions, or failure of any Seller to obtain, comply with, and deliver to Buyer any tax clearance or certificate of no tax due or similar document.

"F&H IP" has the meaning set forth in the preamble.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended or stayed, and for which the time to further

appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Financing Order" means that certain *Final Order Authorizing Debtors to: (a) Continue to Use Cash Collateral; (b) Incur Postpetition Debt; and (c) Grant Adequate Protection and Provide Security and Other Relief to Fun Eats and Drinks LLC, as Lender*, which has been filed in the Bankruptcy Cases.

"First Lien Credit Agreement" means that certain Credit Agreement dated as of March 12, 2014, by and among Guarantor, certain of the Sellers as borrowers, Prepetition Senior Agent, and the lenders party thereto as amended, modified and supplement from time to time.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"Franchise Agreements" means those certain franchise agreements between the Sellers and various franchisees.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Holding I" has the meaning set forth in the preamble.

"Holding II" has the meaning set forth in the preamble.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and

renewals thereof; (d) trade secrets; and (e) all other intellectual property rights related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a)iii.

"Inventory" means all of Sellers' now owned and hereafter acquired consumable food, alcoholic beverages, and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"KS Last Call" has the meaning set forth in the preamble.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Decree of any Governmental Entity.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers which is used in the Business.

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Lien" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Liquor Licenses" shall have the meaning set forth in Section 3.12(b).

"Liquor License Approvals" shall have the meaning set forth in Section 6.12.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

8

"Management Agreement" means the Master Interim Management Agreement in substantially the form attached as Exhibit G hereto.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Acquired Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes directly attributable to the announcement of this Agreement or any Related Agreement; (v) resulting from any act of God or other force majeure event (including natural disasters); (vi) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; or (vii) seasonal changes in the results of operations (provided that such seasonal changes are consistent with the historic experience of the Business) or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"MD Last Call" has the meaning set forth in the preamble.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA and that is subject to Title IV of ERISA, to which any Seller or ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Operating I" has the meaning set forth in the preamble.

"Operating II" has the meaning set forth in the preamble.

"Ordinary Course of Business" means the ordinary course of business of Sellers consistent with past custom and practice and subject to any modifications of such practice as a result of the filing of the Chapter 11 Cases.

"PACA/PASA Claims" means any claims against the Sellers under the Perishable Agricultural Commodities Act of 1930 or any similar state statutes of similar effect or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181, *et seq.* timely filed and served pursuant to the Order Granting Motion of the Debtors for Entry of an Order (I) Fixing a Deadline and Establishing Procedures for Filing Requests for Allowance of (A) Administrative Claims Under 11 U.S.C. § 503(b)(9) and (B) Statutory Trust Claims Pursuant to the Perishable Agricultural Commodities Act and Packers and Stockyards Act of 1921; (II) Approving the Form, Manner, and Sufficiency of Notice Thereof and (III) Granting Related Relief [Docket No. 172] in the Chapter 11 Cases.

"PACA Escrow" means the escrow funded by the debtors (using draws under the DIP Financing) to satisfy PACA/PASA Claims.

"Parties" has the meaning set forth in the preamble.

"Pension Plan" means any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by a Seller or ERISA Affiliate or to which any Seller or ERISA Affiliate contributes or has an obligation to contribute, or has made contributions at any time during the preceding six plan years.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes not yet delinquent; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings, or which have priority over the DIP Financing in accordance with the Financing Order; (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; and (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or

would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" means August 10, 2016.

"Plan" means a plan of reorganization or liquidation proposed by the Sellers and/or the Committee.

"Postpetition Lender" means Fun Eats and Drinks LLC.

"Pre-Closing Tax Period" means a taxable period of a Seller or the Business that begins before and ends on or before the Closing Date.

"Prepetition Senior Agent" means Fun Eats and Drinks LLC, in its capacity as Agent under that certain Credit Agreement dated as of March 12, 2014, by and among Guarantor, certain of the Sellers as borrowers, Prepetition Senior Agent, and the lenders party thereto, as amended, modified and supplemented from time to time.

"Prior Management Agreements" means those certain (i) Management Agreement between Operating I and Campbell Beverage Corp. dated June 17, 2015 and (ii) Management Agreement between Operating I and Fox & Hound Club dated November 5, 2015.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Restaurant" has the meaning ascribed to such term in the Management Agreement.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignments, the Applicable Promissory Note, the Management Agreement and the Transition Services Agreement and any other instruments of

transfer and conveyance as may be required under applicable Law to convey valid title of the Acquired Assets to Buyer or otherwise consummate the Contemplated Transactions.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Motion" means the *Motion Of The Debtors For Entry Of Orders (I)(A) Approving Bid Procedures Relating To The Sale Of All Or Substantially All Of Their Assets, (B) Establishing Procedures In Connection With The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (C) Approving Notice Procedures, And (E) Granting Related Relief; And (II)(A) Authorizing The Sale Of Substantially All Of The Debtors Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Approving The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Related Thereto; And (C) Granting Related Relief* [Docket No. 138] filed in the Chapter 11 Cases.

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases in substantially the form of Exhibit A attached hereto or otherwise acceptable to Buyer and Sellers.

"Second Lien Agent" means Cantor Fitzgerald, L.P., as successor agent, under that certain Second Lien Credit and Security Agreement dated as of March 12, 2014 between certain of the Sellers and the Second Lien Agent.

"Secured Parties" has the meaning ascribed to such term in the First Lien Credit Agreement.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of Jonathan Tibus, Stephanie Burke Medley, Wayne Walker, and Roy Messing.

"Straddle Period" means a taxable period of the Business or with respect to any Acquired Asset that commences before the Closing Date and ends after the Closing Date. Taxes arising on the Business or Acquired Assets with respect to a Straddle Period shall be allocated and apportioned to a Pre-Closing Tax Period for the purposes of this Agreement in accordance with the following rule:  (I) any property or ad valorem Taxes on the Business or Acquired Assets shall be apportioned to a Pre-Closing Tax Period based on the number of days in the taxable period ending on the Closing Date over the numbers of days in the whole taxable period, and (II) all other Taxes shall be apportioned to a Pre-Closing Tax Period to the extent incurred as if the Closing Date ended the taxable period.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or

other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed, and including any tax imposed as a result of being a transferee, successor or by contract.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"Transition Services Agreement" means a transition services agreement in a form acceptable to Buyer, which requires Sellers to provide certain services requested by Buyer during a transition period in exchange for Buyer's direct payment of costs associated therewith (or the reimbursement by Buyer of Seller's direct costs associated therewith) and ensuring that all administrative expenses of Sellers created by virtue of providing such transition services are paid.

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act, or any similar applicable federal, state, provincial, local, municipal, foreign or other Law.

"Winddown Amount" means the amount set forth on the wind-down budget that is included in the DIP Schedule.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Acquired Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Acquired Assets used in or relating to the Business, free and clear of all Liens (other than Permitted Liens), for the

consideration specified in Section 2.5. Without limiting the generality of the foregoing, the Acquired Assets shall include, without limitation, the following (except to the extent included as an Excluded Asset):

(a)    all cash, cash equivalents, bank deposits and similar cash items of Sellers other than the Cash Payment;

(b)    all Accounts Receivable of Sellers as of the Closing;

(c)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing; provided that in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals from the pertinent Governmental Entity, the applicable alcoholic beverage Inventory shall either be utilized by Sellers in the performance of their duties under the Management Agreement or will be in held in trust for Buyer's use in connection with the Acquired Assets so operated by Buyer, to the extent permitted by law;

(d)    without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities, Health Plans (but for Health Plans only the reversionary interest in deposits after winding down of such Health Plans) or otherwise, but excluding the Deposit) and other prepaid charges and expenses of Sellers;

(e)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6 (or, as applicable, Section 2.7);

(f)    all Intellectual Property owned by Sellers;

(g)    all open purchase orders with suppliers related to the Continuing Restaurants;

(h)    all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

(i)    all Records related to the Acquired Assets and Assumed Liabilities, other than Records related to income Taxes of the Sellers (provided that Sellers are entitled to retain copies of all Records);

(j)    all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(k)    all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees,

14

directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(l)      without limitation of clause (k), all rights of Sellers under non-disclosure or confidentiality agreements executed by any third party in favor of Sellers prior to the Closing;

(m)      all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Continuing Restaurants, including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Entity (in which case Sellers shall transfer, assign, convey and deliver to Buyer such permits in each instance upon issuance of the requisite approvals from the relevant Governmental Entity, in each case in accordance with the Management Agreement);

(n)      any rights to Liquor Licenses held by Sellers that are not related to Continuing Restaurants but are otherwise saleable or transferable to third parties;

(o)      the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(p)      all other rights, demands, claims, credits, allowances, rebates or other refunds (including any vendor or supplier rebates) and  rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Continuing Restaurants as of the Closing, including all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

(q)      except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Acquired Avoidance Actions;

(r)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Acquired Assets and/or Assumed Liabilities;

(s)      the right to receive and retain mail relating to, Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(t)      all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names;

(u)      without duplication of the above, all other current assets of Sellers as of the Closing;

(v)      all rights under any surety bonds;

(w)      any unused retainers paid by the Sellers to any third party prior to the Closing (for professional services or otherwise), or any amounts remaining in any escrow or similar account used to fund the same (including without limitation amounts held in the professional fee escrow established under the Financing Order), in each case that exist after professional fees of the Sellers are fully reconciled and paid by final order of the Bankruptcy Court;

(x)      all reversionary rights in cash collateral securing any letters of credit or similar instruments on the Sellers' behalf;

(y)      any amounts remaining in the PACA Escrow following satisfaction of all PACA/PASA Claims;

(z)      all Designation Rights Assets; and

(aa)      all other assets that are related to or used in connection with the Acquired Assets or the Business (but excluding all of the Excluded Assets).

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Acquired Assets so as to include additional assets in its sole and absolute discretion until the Closing (except that Buyer may not add as an Acquired Asset anything specifically listed as an Excluded Asset below (except with respect to Section 2.2(c) below); and provided that no such addition shall result in any adjustment to the Purchase Price.  Furthermore, Buyer may, from time to time, remove any Acquired Asset from this Section 2.1 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset in accordance with Section 2.7 or as an Excluded Asset.  Buyer shall pay any net increase in the administrative costs resulting directly from such addition or removal of assets as an Acquired Asset such that there will be no net negative effect on the bankruptcy estate resulting from any such addition or removal of assets as an Acquired Asset.

Section 2.2    Excluded Assets.    Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "**Excluded Assets**"):

(a)      all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with

registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b)     all equity securities of any Seller and all net operating losses of any Seller;

(c)     all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts (or Designation Rights Assets, as applicable);

(d)     the Excluded Claims;

(e)     any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(f)     any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Acquired Asset;

(g)     all Permits other than the Assumed Permits (or rights described in Section 2.1(n) above);

(h)     all directors' and officers' liability insurance policies;

(i)     the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement; and

(j)     Tax Refunds of the Sellers with respect to a Pre-Closing Tax Period, other than any Straddle Period.

**Section 2.3     Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.6 or 2.7), Buyer shall either (x) cause to be funded pursuant to the DIP Agreement or (y) assume and become responsible for the liabilities described on Schedule 2.3 as Assumed Liabilities, in each case related to the period through and including the End Date, and shall assume no other liabilities of Sellers or any of their Affiliates, and from and after the Closing agrees to timely pay, honor and discharge, or cause to be timely paid, honored and discharged, all Assumed Liabilities in accordance with the terms thereof.

17

**Section 2.4    Excluded Liabilities**.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of Sellers of any nature, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").  For the avoidance of doubt, all Excluded Taxes shall be treated as Excluded Liabilities (except to the extent specifically stated otherwise in the definition of such term).

**Section 2.5    Consideration**.  In consideration of the sale of the Business and the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price") shall be composed of the following:

(a)    the payment of an amount in cash (the "Cash Payment") equal to the sum of (x) the Cure Amounts related to the Assumed Contracts, (y) the amount of the fee of SSG Advisors, LLC associated with the sale effectuated under this Agreement, plus (z) subject to Section 8.1(g) below, the amounts by which PACA/PASA Claims exceed the PACA Escrow (with any such amount being used to increase the PACA Escrow);

(b)    an amount equal to the DIP Amount, payable solely in the form of a reduction of the obligations owed to Purchaser under the DIP Facility on a dollar-for-dollar basis (a "Credit Bid");

(c)    the assumption by Buyer of the Assumed Liabilities;

(d)    the assumption of the obligation to fund the Winddown Amount, in cash (in each case, to the extent such amounts have not been advanced via draws under the DIP Facility);

(e)    $8,916,597.00 in the form of the Applicable Promissory Note payable to Prepetition Senior Agent, for the benefit of the Secured Parties under the First Lien Credit Agreement, and deemed to be in satisfaction of $8,916,597.00 of the "Obligations" in clauses "first" through "fourth" in Section 1.12(c) of the First Lien Credit Agreement; and

(f)    $500,000.00 in the form of Applicable Preferred Units issuable to Prepetition Senior Agent, for the benefit of the Secured Parties under the First Lien Credit Agreement, and deemed to be in satisfaction of $500,000 of the "Obligations" in clauses "fifth" through "eighth" in Section 1.12(c) of the First Lien Credit Agreement.

**Section 2.6    Assumption and Assignment of Contracts**.

(a)    Section 2.6(a) of the Disclosure Schedule (the "Assumed Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has

designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract.  In addition to the Buyer's rights pursuant to Sections 2.7 and 5.9, from and after the date hereof, until the Closing, Buyer shall be entitled to make additions and deletions to the Assumed Contract List by delivery of written notice to Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted); provided that Buyer shall pay any net increase in the sum of Cure Amounts and non-debtor counterparties' Administrative Claims resulting directly from such designation of additional Assumed Contracts and additional rejection of Contracts listed on the Assumed Contract List (the intent being that there will be no net negative effect on the bankruptcy estate due to a net increase in Cure Amounts and non-debtor counterparties' Administrative Claims resulting from any additional assumptions or rejections).  Any such deleted Contract shall be deemed to no longer be an Assumed Contract and any such added Contract shall be deemed an Assumed Contract.  Any Contract that is designated (or deemed to be designated) for exclusion and rejection pursuant to this Section 2.6(a) shall constitute an "Excluded Contract" as of the Closing Date, subject in all respects to Section 2.7 below.

(b)      In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.6, the allowed cure amounts, if any (such amounts, the "Cure Amounts"), necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, shall be paid by Buyer at the Closing as part of the Purchase Price in Section 2.5(a).

(c)      Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer (the "Assumption Approval") on the terms set forth in this Section 2.6.  In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder that are not otherwise funded under the DIP Facility or paid by Buyer and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 2.7      Designation Rights.**

(a)      During the Designation Rights Period, Sellers shall (A) not reject any Contract unless such Contract is expressly designated by Buyer in writing as an Excluded Contract under Section 2.6, Buyer fails to pay amounts owed with respect to such Contract in accordance with subsection (b) of this Section 2.7 (after having been afforded written notification and an opportunity to cure such failure in accordance with this Agreement) or unless otherwise agreed to in writing by Buyer and (B) hold all Permits

19

and other assets specified by Buyer in writing in abeyance pending designation for assignment or exclusion by Buyer in accordance with this <u>Section 2.7</u>.

(b)    Any Contract not designated by Buyer in writing as either an Assumed Contract on the Assumed Contract List, or an Excluded Contract by express notice of the same, and any Permits and other assets designated in writing by Buyer, in each case prior to Closing, shall constitute a "<u>Designation Rights Asset</u>." Buyer shall have the right, by written notice to Sellers within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in this Section 2.7, and (B) any Designation Rights Asset that is not a Contract shall be held by Sellers in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Buyer in accordance with this Section 2.7. With respect to any Designation Rights Asset, (i) Buyer shall be solely responsible for and directly pay for all costs associated with the continuation, operation or holding by Sellers of such Designation Rights Asset, for the period from the Closing through the date of rejection of such Designation Rights Asset, in each case to the extent such represents an allowed administrative claim, (ii) for the avoidance of doubt, all consideration received by Sellers in respect of, and other benefits deriving from, such Designation Rights Asset (including Designation Rights Assets sold or assigned to third parties in accordance with clause (c) below) shall be promptly delivered to Buyer, (iii) if such Designation Rights Asset is a Lease and if Buyer is granted access to and uses such property prior to designating such Lease as an Assumed Contract, Buyer shall purchase insurance (including liability and casualty policies) covering such real property consistent with Sellers' past practices and shall name Sellers as an additional party under such policies, and (iv) the foregoing shall not affect the validity of the transfer to Buyer of any other Acquired Asset whether or not related to such Designation Rights Asset. For the avoidance of doubt, Buyer shall retain the right to use all Furniture, Equipment, supplies and Inventory at any Designation Rights Restaurant (as defined in the Management Agreement), and to receive one hundred percent (100%) of the proceeds from the sale or use of such Furniture, Equipment, supplies and Inventory, in each case during the Designation Rights Period.

(c)    As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "<u>Designation Notice</u>") from Buyer during the Designation Rights Period requesting assumption, assignment and sale of any Designation Rights Asset to Buyer or a third party, Sellers shall, subject to Buyer or such third party demonstrating adequate assurance of future performance thereunder and paying all Cure Amounts to the extent required by Section 365 of the Bankruptcy Code, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume, assign and sell to Buyer or such third party the applicable Designation Rights Asset pursuant to Section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, Section 365 of the Bankruptcy Code.

(d)    Following the end of the Designation Rights Period or, if earlier, the rejection date of a Designation Rights Asset, a Designation Rights Asset shall be deemed to be an Excluded Asset for all purposes under this Agreement except with respect to

20

Buyer's obligations to pay all amounts associated with such Designation Rights Asset as expressly required by Section 2.7(b) above.

(e)      Sellers and Buyer agree and acknowledge that the covenants set forth in this Section 2.7 shall survive the Closing.

(f)      Notwithstanding anything in this Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Buyer or its designee pursuant to this Section 2.7, such Designation Rights Asset shall be deemed an Acquired Asset for all purposes under this Agreement and no further consideration (except for the applicable Cure Amount with respect to Designation Rights Assets that are Contracts) shall be required to be paid for any Designation Rights Asset that is assumed, assigned and sold to Buyer or its designee.

(g)      Sellers shall use reasonable best efforts to extend the deadline for assumption or rejection of any Designation Rights Asset that is a Lease for the maximum permitted period of time under Section 365 of the Bankruptcy Code.

(h)      If the Parties hereto intend for any Assumed Contracts or other assets relating to a specific Purchased Restaurant to be transferred to Buyer at Closing (and all conditions specified in Article VII have been met with respect to such assets) but Buyer has not obtained Liquor License Approvals necessary to sell alcohol at such Purchased Restaurant and applicable Law prohibits the operation of such Purchased Restaurant (including the sale of alcohol at such Purchased Restaurant) pursuant to the terms of the Management Agreement, then any Assumed Contracts or other assets associated with such Purchased Restaurant shall be deemed to be Designation Rights Assets as of the Closing for all purposes and in all respects. Buyer shall notify Sellers of all Assumed Contracts and other assets that Buyer believes may be subject to this Section 2.7(h) no later than two (2) days prior to the Closing Date; provided, that all Assumed Contracts and other assets associated with such Purchased Restaurant shall not be deemed to be Designation Rights Assets at Closing if the Liquor License Approvals for the applicable Purchased Restaurant are obtained by Buyer prior to or at Closing.

**Section 2.8      Closing**.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing at 11:00 a.m. local time on the date (the "Closing Date") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  The Closing shall be deemed to have occurred at 11:59 p.m. (prevailing Eastern time) on the Business Day prior to the Closing Date.

**Section 2.9**     **Deliveries at Closing**.

    (a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

    i.     one or more Bills of Sale substantially in the form of <u>Exhibit B</u> attached hereto ("<u>Bill of Sale</u>");

    ii.     one or more Assignment and Assumption Agreements substantially in the form of <u>Exhibit C</u> attached hereto ("<u>Assignment and Assumption Agreement</u>");

    iii.     instruments of assignment substantially in the forms of <u>Exhibit D</u>, <u>Exhibit E</u> and <u>Exhibit F</u> attached hereto for each registered trademark, registered copyright and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "<u>Intellectual Property Assignments</u>");

    iv.     a duly executed IRS Form W-9 from each Seller and (except with respect to Guarantor) a non-foreign affidavit from each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such Seller is not a "foreign person" as defined in Section 1445 of the IRC;

    v.     (A) a bulk sale tax clearance certificate, a tax clearance certificate or certificate of no tax due from each state, foreign, and local government in which an Acquired Asset or a Seller is located to the extent for Tax purposes that is deemed necessary under applicable Law to prevent Buyer from being liable for the Taxes of any Seller or the Acquired Assets with respect to any Pre-Closing Tax Period (if and to the extent that the Sale Order does not fully prevent Buyer from incurring such liability) or (B) the certificate or other notice from each state, foreign and local government in which an Acquired Asset or a Seller is located reflecting the sales Taxes due for any Straddle Period or Pre-Closing Tax Period;

    vi.     the Management Agreement;

    vii.     if deemed necessary by Buyer, a Transition Services Agreement; and

    viii.     the officer's certificate required by <u>Section 7.1(f)</u>.

    (b)     At the Closing, Buyer shall deliver to Sellers, or the designated third-party recipients pursuant to <u>Section 2.5</u>, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

    i.     the Assignment and Assumption Agreement(s);

ii.     the Cash Payment by wire transfer of immediately available funds to one or more bank accounts designated by Sellers or the designated third-party recipients thereof (including to such other third party recipients as provided in Section 2.5(a)) in writing to Buyer;

iii.    the Applicable Promissory Note;

iv.     the Applicable Preferred Units; and

v.      the officer's certificate required by Section 7.2(e).

**Section 2.10    Allocation**.    The Parties agree and intend that the transactions contemplated herein are intended to constitute a taxable asset acquisition for federal and state income Tax purposes and not as any "reorganization" within the meaning of Section 368 of the IRC.   Within thirty (30) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate).  Sellers shall have thirty (30) days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule.  Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation and this Section 2.10. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with this Section 2.10 unless required to do so by a "determination" within the meaning of Section 1313 of the IRC to the contrary.

**Section 2.11    Excluded Locations**.   As of the Closing (or after the Closing with respect to Section 2.7), (i) any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts in accordance with Section 2.6(a) or 2.7 shall be deemed to have been classified as Continuing Restaurants, and (ii) any of Sellers' store locations with respect to which the associated Leases have been classified as Excluded Contracts in accordance with Section 2.6(a) or 2.7 shall be deemed to have been classified as Excluded Locations.

**Section 2.12    Deposit**.  As its deposit hereunder (the "Deposit"), Buyer will provide a consent to the reduction of its secured claim under the DIP Facility by an amount equal to the Deposit Amount.  In the event that the Closing occurs, the Deposit shall be deemed null and void (upon satisfaction of the Credit Bid).   Upon termination of this Agreement prior to a Closing, if applicable, the treatment of the Deposit shall be in accordance with Section 8.4 below.
.

# ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES.

Each of the Sellers jointly and severally represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

**Section 3.1      Organization of Sellers; Good Standing**.

      (a)      Each Seller is duly organized, validly existing and, to the extent applicable, in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

      (b)      Each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

      (c)      None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2      Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

      (a)      each Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other corporate action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

      (b)      this Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3**     **Noncontravention; Consents and Approvals**.

    (a)     Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Assignments and Assumptions Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, by-laws or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) subject to the entry of the Sale Order, conflict with, any Assumed Contract, and, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

    (b)     Except as set forth in Section 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

    **Section 3.4**     **Compliance with Laws**.   Sellers are in compliance with all material Laws applicable to the Business or the Acquired Assets.

    **Section 3.5**     **Title to Acquired Assets**.   Sellers, as of the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

    **Section 3.6**     **Contracts**.Section 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material Contracts to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available, or within one (1) day of the date hereof shall make available, to Buyer true and complete copies of all such Contracts.

**Section 3.7    Intellectual Property**.

(a)    Section 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller and used in or related to the Business, (ii) all material Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property.  Sellers own all such Registered Intellectual Property free and clear of all Liens (except for Permitted Liens and subject to entry of the Sale Order), and all such Registered Intellectual Property is valid, subsisting and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge and except as set forth on Section 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Acquired Assets, the conduct of the Business as currently conducted, nor any of the Products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Acquired Assets, including, without limitation, the use of Intellectual Property pursuant to the Franchise Agreements and the Prior Management Agreements.

**Section 3.8    Litigation**.  Section 3.8 of the Disclosure Schedule sets forth all material Litigation brought by or against any Seller, and to Sellers' Knowledge, there is no other material Litigation threatened in writing, before any Governmental Entity against any Seller.

**Section 3.9    Employees and Employment Matters**.  No Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the date of this Agreement) or former employees of the Sellers, nor is there any ongoing strike, walkout, work stoppage, or other material collective bargaining dispute affecting any Seller with respect to the Business.  To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the date of this Agreement). Within two (2) days of the date hereof, Sellers shall make available to Buyer a list of all Current Employees.

**Section 3.10    Employee Benefit Plans**.

(a)    Section 3.10 of the Disclosure Schedule lists each Employee Benefit Plan that Sellers maintain or to which any Seller may have an obligation to contribute, including as a result of being an ERISA Affiliate.  With respect to each such Employee Benefit Plan:

i.    such Employee Benefit Plan, if intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service or may rely

26

on a favorable opinion letter issued by the Unites States Internal Revenue Service; and

        ii.        Sellers have made available to Buyer accurate summaries of all such Employee Benefit Plans.

(b)      Each Employee Benefit Plan has been established, funded, maintained and administered in accordance with its terms and all applicable Laws, including ERISA and the IRC.  As of the date hereof, there is no pending or, to Sellers' Knowledge, threatened, Litigation relating to the Employee Benefit Plans.

(c)      No Seller has, or has had in the last six years, any liability to make contributions to any Pension Plan or Multiemployer Plan.

**Section 3.11**   **Real Property**.

(a)      Sellers do not own any real property.

(b)      Section 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property.  Sellers have made available to Buyer true and complete copies of such Leases, as amended through the date hereof.

**Section 3.12**   **Permits**.

(a)      Section 3.12(a) of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the date hereof in connection with the operations of the Business.  As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits. To Sellers' Knowledge, all required filings with respect to the material Assumed Permits have been made and all required applications for renewal thereof have been filed.

(b)      Section 3.12(b) of the Disclosure Schedule sets forth a complete and correct list as of the date of this Agreement of all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller, including the Person in whose name such license is issued, date of issuance and renewal date (collectively, the "Liquor Licenses").  Each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller, subject to and in accordance with all applicable provisions of the Liquor Licenses.   To the Knowledge of Sellers, except as set forth in Section 3.12(b) of the Disclosure Schedule, since December 31, 2014, (i) there has been no material Litigation brought or threatened to be brought by or before a Governmental Entity in respect of any such Liquor License or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License is subject to any due but unpaid Tax obligation owed to a

Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Entity to be revoked, limited or not renewed

**Section 3.13    Brokers' Fees**.  Except for amounts due to SSG Advisors, LLC (which amounts are a component of the Cash Payment of the Purchase Price) or as stated on <u>Section 3.13 of the Disclosure Schedule</u>, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.14    Taxes**.  Except as set forth on Section 3.14 of the Disclosure Schedule:

(a)    Each Seller has timely and duly filed all Tax Returns that it was required to file (including by way of being a member of a consolidated, combined, or unitary tax group), and has paid all Taxes shown as due and payable on such Tax Returns and other Taxes due and owing, whether or not shown on a Tax Return.  All such Tax Returns were true, correct, and complete in all material respects.  Each Seller has withheld and paid over to the appropriate Tax authority all Taxes that it was required to withhold from amounts paid or owing to any employee, creditor or other third party and has obtained, and maintained in accordance with applicable Law, all required documentation to obtain any exemption from or reduction in rate for withholding.

(b)    No Seller has waived any statute of limitations with respect to any Taxes or agreed to any extension of time with respect to any Tax assessment or deficiency that has not yet been resolved, in each case, with respect to the Business.

(c)    No Seller has received written notice from any Governmental Entity  that any audit or other examination of any Tax Return with respect to the Business is requested or presently in progress.

(d)    No Seller has entered into, or has pending, with any Taxing authority any closing agreement, consent, letter ruling, determination letter, accounting method change, or other agreement with respect to its Taxes (and no other Person has entered into any such agreements. consents, or letter rulings on behalf of any Seller and no Governmental Entity has asserted against any Seller, any deficiency or claim for additional Taxes.

(e)    There are no Liens for Taxes on any of the Acquired Assets, other than for property Taxes not yet due and payable.

(f)    No Seller has received a written claim in the past six (6) years by any Governmental Entity in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to Tax in that jurisdiction, in each case, with respect to the Business.

(g)    No power of attorney currently in force has been granted by any Seller with respect to any Tax matter of the Seller or the Business and no power of attorney currently in force has been granted with respect to the Taxes of or related to the Business by any Acquired Asset.

(h)    All compensation arrangements with any employee or other service provider to any Seller comply with, or are exempt from, IRC Section 409A and similar state and local laws, and no Seller has any obligation to make payment for, or indemnify, any Person for Taxes imposed by IRC Section 409A or any similar state or local law.

(i)    No Acquired Asset is tax-exempt use property within the meaning of Section 168 of the IRC or subject to any lease that is a subject to Section 467 of the IRC or similar state law.

(j)    Each Seller has properly obtained and maintained all exemption certificates and records necessary to comply with any excise, employment, withholding, license, liquor, sales, use, ad valorem, personal property, headcount, transfer, or similar Taxes and Buyer shall not have any liability with respect to any such Taxes of any Seller under Applicable Law.

(k)    No Seller has participated or is participating in the transactions contemplated herein as part of a "listed transaction" or "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

**Section 3.15  <u>No Other Representations or Warranties</u>**.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>Article III</u> (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE ACQUIRED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY ACQUIRED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>Article III</u> (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE ACQUIRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE ACQUIRED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES).  THE DISCLOSURE OF ANY MATTER

29

OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

**ARTICLE IV**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

Buyer represents and warrants to Sellers as follows:

**Section 4.1    Organization of Buyer**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Wyoming and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer.  Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**.  Neither the execution and delivery of this Agreement or any Related Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Article II) will (i) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any

30

Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

      **Section 4.4**    **Financial Capacity**.  As of the Closing, Buyer (i) will have the resources (including sufficient funds available to pay the cash portion of the Purchase Price and any other expenses and payments incurred by Buyer in connection with the transactions contemplated by this Agreement) and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Agreements, and (ii) will not have incurred any obligation, commitment or restriction that would impair or affect in a materially adverse manner such resources or capabilities.

      **Section 4.5**    **Adequate Assurances Regarding Executory Contracts**.  Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

      **Section 4.6**    **Good Faith Purchaser**.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.  Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Acquired Assets. Buyer has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

      **Section 4.7**    **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay**.**

      **Section 4.8**    **Condition of Business**.  Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement, Sellers (including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Business. Buyer will accept the Acquired Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.

(a)    Each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2.

(b)    On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Acquired Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order); provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder (other than such expenses contemplated in the Winddown Amount) and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.  Without limitation of the foregoing, Sellers shall comply with their obligations under the Management Agreement.

**Section 5.2    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Buyer shall pay Sellers directly for any post-Closing costs associated directly with the obligations hereunder that are performed at the request of Buyer to the extent that such expenses are of a material amount or are out of the ordinary course such that they are not contemplated by the Winddown Amount, and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(b)    Sellers and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that (i) Buyer shall

32

pay Sellers directly for any post-Closing costs associated directly with the obligations hereunder that are performed at the request of Buyer to the extent that such expenses are of a material amount or are out of the ordinary course such that they are not contemplated by the Winddown Amount), and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(c)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) to remove details concerning financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

## Section 5.3    Bankruptcy Actions.

(a)    Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Acquired

33

Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers.

(b)    Sellers shall serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Bid Procedures Order and provide a copy of the same to Buyer.

**Section 5.4    Conduct of Business**.    Except as expressly contemplated by this Agreement or required under the Bankruptcy Code or other applicable Law and except to the extent waived by Buyer's prior written consent:

i.    Sellers shall use reasonable best efforts to maintain, preserve and protect all of the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

ii.    Sellers shall use reasonable best efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

iii.    No Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets except as permitted by this Agreement;

iv.    No Seller shall distribute any cash, or use any cash except (x) to pay obligations incurred after the Petition Date in the ordinary course of business or (y) for professional fees for the services and amounts consistent with the DIP Schedule;

v.    No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien or  Claim except for Permitted Liens;

vi.    No Seller shall assume, reject or assign any Contract other than the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement (including Sections 2.6, 2.7 and 5.9), to Buyer;

vii.    No Seller shall enter into new Contracts other than those both in the Ordinary Course of Business and consented to by Buyer;

viii.    Sellers shall make all post-petition payments related to Assumed Contracts (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof to the extent provided in any financing orders of the Bankruptcy Court;

34

ix.     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Acquired Asset;

x.     No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller;

xi.     Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply with the terms of each such Permit and no Seller shall permit any such Permit to terminate, expire or lapse; and

xii.     Sellers shall (w) conduct the Business in the Ordinary Course of Business, (x) use reasonable best efforts to preserve the existing business organization and keep management of the Business intact, (y) use reasonable best efforts to keep available the services of the existing Employees, to the extent reasonably feasible, and (z) use reasonable best efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Employees and others having business dealings with the Business.

**Section 5.5    Notice of Developments**.  From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

**Section 5.6    Access**.

(a)     Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

(b)     All information obtained pursuant to this Section 5.6 shall be subject to the terms and conditions of the Confidentiality Agreement.

**Section 5.7    Press Releases and Public Announcements**.  After notice to and consultation with Buyer, Sellers shall be entitled to disclose, if required by applicable Law or by

order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith only to the Bankruptcy Court, the United States Trustee, and to Consultation Parties (as such term is defined in the Bid Procedures Order).    Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction.    Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction.

**Section 5.8    Bulk Transfer Laws**.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, other than to the extent required under Section 2.9(a)(v) above.    The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws (as allowed under applicable law), and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.9    Contracts**.

(a)    If prior to or following Closing it is discovered that a Contract should have been listed on Section 3.6 of the Disclosure Schedule but was not listed on Section 3.6 of the Disclosure Schedule, (any such Contract, a "Previously Omitted Contract"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all proposed Cure Amounts (if any) for such Previously Omitted Contract.    Buyer may thereafter either (x) deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Rejected", in which case such Previously Omitted Contract shall be deemed an Excluded Contract under Section 2.6, (y) deliver written notice to Sellers, no later than the Closing, designating such Previously Omitted Contract as "Assumed", in which case such Previously Omitted Contract shall be deemed an Assumed Contract under Section 2.6, or (z) treat such Previously Omitted Contract as a Designation Rights Asset (provided that, for the avoidance of doubt, Buyer shall not be responsible for any costs related to any Contract that is rejected pursuant to clause (x) above, even if Buyer's rejection notice to Sellers for such Contract is after the Closing, to the extent that Buyer has complied with the timeframe set forth in such clause (x)).

(b)    If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 5.9(a), (A) Schedule 2.6(a) shall be amended to include such Previously Omitted Contract and (B) Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the proposed Cure Amounts with respect to such Previously Omitted Contract and Sellers' intention

to assume and assign such Previously Omitted Contract in accordance with this Section 5.9 with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven (7) days to object, in writing to the Sellers and Buyer, to the Cure Amount and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Buyer, Sellers shall obtain an Order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract.

## ARTICLE VI
## OTHER COVENANTS.

The Parties agree as follows with respect to the period from and after the Closing, provided that (i) Buyer shall pay Sellers directly for any post-Closing costs associated directly with the obligations hereunder that are performed at the request of Buyer to the extent that such expenses are of a material amount or are out of the ordinary course such that they are not contemplated by the Winddown Amount and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**.  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions (including without limitation complying with the terms of the Transition Services Agreement, if applicable).

**Section 6.2    Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which should have been transferred or assigned to Buyer as Acquired Assets but were not so transferred or assigned, each such additional asset or property shall be deemed an Acquired Asset for all purposes and Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3    Availability of Business Records**.  For a period of twelve months after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all

37

Records included in the Acquired Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) twelve months after the Closing Date, (ii) the required retention period for all government contact information, records or documents (solely for such information which such requirement applies), or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases.  Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing during the twelve month period described herein, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense. With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim at Sellers' expense and (upon comfort that Buyer's expenses will be appropriately paid or reimbursed to it) shall make available to Sellers such personnel as are most knowledgeable about the matter in question.

**Section 6.4    <u>Employee Matters</u>**.

(a)    Each Seller shall, effective as of the day prior to the Closing Date, discharge all Current Employees. Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer) to employ such Current Employees as it elects (i) to operate the Continuing Restaurants, with employment commencing as of the Closing Date or (ii) to be employed in the Buyer's head office with employment commencing on the Closing Date.  For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "<u>Offeree</u>."  Prior to the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "<u>Transferred Employee</u>."  Each offer to an Offeree shall be on such terms as is acceptable to the Buyer.

(b)    Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "<u>Excluded Employee</u>."

(c)    Following the date of this Agreement,

i.    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours; *provided*, *however*, that such access shall not unduly interfere with the operation of the Business prior to the Closing;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under <u>Section 6.4(a)</u> to make offers of employment to any Offeree, or (B) solicit or

encourage any Offeree not to accept, or to reject, any such offer of employment; and

   iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d)    Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Buyer,

   i.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers.  Seller shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date; and

   ii.    Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees.

(e)    Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person.  Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.5    Recording of Intellectual Property Assignments**.  All of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Entities as promptly as practicable following the Closing.

**Section 6.6    Transfer Taxes**.  To the extent not exempt under section 1146 of the Bankruptcy Code, then Buyer shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by this Agreement.  Sellers and Buyer shall cooperate to timely prepare and timely file any Tax Returns required to be filed with respect such Transfer Taxes.

**Section 6.7**   **Wage Reporting**.   Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8**   **Acknowledgements**.   Buyer acknowledges that it has received from Sellers certain projections, forecasts and prospective or third party information relating to Sellers, the Business, the Acquired Assets, the Assumed Liabilities or any related topics.   Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information, and (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts and information so furnished.   Accordingly, without limiting the generality of Section 3.14, Sellers make no representations or warranties with respect to such projections, forecasts or information.

**Section 6.9**   **Insurance Policies**.

(a)   To the extent that the rights under any current or prior Insurance Policy are not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Acquired Assets or the Assumed Liabilities.   In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Acquired Assets, and Sellers shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Sellers in connection therewith (or, if applicable, Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

(b)   To the extent that any current or prior Insurance Policy of any Seller relates to the Acquired Assets or Assumed Liabilities and the Excluded Assets or the Excluded Liabilities, and such Insurance Policy is transferred to Buyer at the Closing, Buyer shall hold such Insurance Policy with respect to the Excluded Assets or Excluded Liabilities, as applicable, for the benefit of Sellers, shall reasonably cooperate with Sellers in pursuing any claims thereunder, and shall pay over to Sellers promptly any insurance proceeds paid or recovered thereunder solely with respect to the Excluded Assets or the Excluded Liabilities.

(c)   Notwithstanding subparagraphs (a) and (b) above, nothing in this Article or Agreement shall transfer any directors and officers' liability insurance policies relating to the Sellers to the Buyer.

(d)   Buyer shall pay Sellers directly for any post-Closing costs associated directly with the obligations hereunder that are performed at the request of Buyer to

Case 16-11844-KG    Doc 388-3    Filed 09/28/16    Page 46 of 67

the extent that such expenses are of a material amount or are out of the ordinary course such that they are not contemplated by the Winddown Amount.

**Section 6.10    Collection of Accounts Receivable.**

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Seller's order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments.  In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing, in each case solely to the extent that such constitutes Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Acquired Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.11    Use of Name and Marks.**  Except as contemplated under the Franchise Agreements and the Prior Management Agreements, neither Sellers nor any of their Affiliates shall use, license or permit any third party to use, any name, slogan, logo or trademark which is similar or deceptively similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Acquired Assets.

**Section 6.12    Liquor License Approvals.**  Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to the transfer and/or issuance of any of the Liquor Licenses to Buyer ("Liquor License Approvals"), and shall comply with the terms of the Management Agreement regarding the same in all respects.

**Section 6.13    Data Privacy Protection.**  Buyer acknowledges that the Acquired Assets include personally identifiable information ("PII") within the meaning of Section 363(b) of the Bankruptcy Code, along with associated personal information about the Sellers' customers. In

41

connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties.  The Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers) and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Acquired Assets.  Buyer shall require express consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection. Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

Section 6.14    **Gift Cards**.    Within a reasonable time after the Closing, Buyer intends to establish a program for the Business, which program may in Buyer's discretion honor any or all of the existing gift card obligations of Sellers existing as of the Closing.

Section 6.15    **Name Change**.    Within twenty-one (21) days after the Closing, Sellers shall take steps necessary to effect a change in any of its corporate names to remove "Champps", "F&H" or "Fox & Hound" from such names.  As all Intellectual Property of Sellers are Acquired Assets, Sellers agrees after Closing to cease use of any service marks, trademarks, trade names, logos, emblems, signs or insignia related to the Intellectual Property owned by Sellers prior to Closing and, immediately after Closing, to cease holding themselves out as having any affiliation with the Business (other than for the arrangements under this Agreement and the Related Agreements).

Section 6.16    **Covenant Not to Sue**.    Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert any claim relating to the Acquired Avoidance Actions against any of Sellers' vendors, landlords, directors, officers or employees, before any court, arbitrator, mediator or administrative agency anywhere in the world.  Buyer further covenants and agrees that it shall not assign the Acquired Avoidance Actions or claims against Sellers' vendors, landlords, directors, officers or employees to any third party.  Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert any claim relating to any other causes of actions so acquired in the Acquired Assets against any director or officer of the Sellers.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**.    Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2 or Section 3.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have become a Final Order (unless this condition has been waived in writing by Buyer);

(e)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(f)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(e) has been satisfied; and

(g)    There shall not be a payment default that was caused by a material breach or default, or a sale covenant default which was caused by the action or inaction of Sellers, in either the DIP Agreement or any other documents governing the DIP Facility.

43

**Section 7.2** **Conditions to Sellers' Obligations**.  Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have become a Final Order (unless Buyer has waived the condition under Section 7.1(d));

(e)    Buyer shall have delivered the Applicable Promissory Note and issued the Applicable Preferred Units; and

(f)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3** **No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

44

## ARTICLE VIII
## TERMINATION.

**Section 8.1    Termination of Agreement**.  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any material covenant contained in this Agreement in any material respect, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(c)    by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant contained in this Agreement in any material respect, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

(d)    by Buyer, on the one hand, or Sellers, on the other hand, if the Closing shall not have occurred by October 31, 2016; provided, however, that (i) Buyer shall not have the right to terminate this Agreement under this Section 8.1(d) or Section 8.1(b) if, at the time of such termination, Sellers would then be entitled to terminate this agreement pursuant to Section 8.1(c) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(c)), and (ii) Sellers shall not have the right to terminate this Agreement under this Section 8.1(d) or Section 8.1(c) if, at the time of such termination, Buyer would then be entitled to terminate this agreement pursuant to Section 8.1(b) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(b));

(e)    by Buyer if the Sale Order shall not have been entered by the Bankruptcy Court by September 30, 2016 (as such date may be extended at the sole option of the Buyer); or

(f)    automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon the issuance of a final and non-appealable Order,

decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing.

(g)      By Buyer if (x) the amount of PACA/PASA Claims existing prior to Closing exceeds the amount set aside in the PACA Escrow by greater than $50,000, or (y) the 503(b)(9) Claims against the Sellers exceeds the amount designated for such claims on the DIP Schedule; provided that for purposes of this <u>Section 8.1(g)</u> the actual amount of PACA/PASA Claims and/or the actual amount of 503(b)(9) Claims shall be determined in good faith in the sole discretion of Buyer.

**Section 8.2**    **Procedure Upon Termination**.   In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to <u>Section 8.1</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3**    **Effect of Termination**.

(a)      If any Party terminates this Agreement pursuant to <u>Section 8.1</u>, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Article I</u> (Definitions), <u>Article IX</u> (Miscellaneous), and this <u>Article VIII</u> (Termination) shall survive any such termination) and no Party shall have any Liability to any other Party with respect to the transactions contemplated by this Agreement, as applicable, except as otherwise expressly set forth in this Agreement.

(b)      Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)      The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this <u>Section 8.3</u> shall relieve Buyer or Sellers of their respective obligations under the Confidentiality Agreement.

**Section 8.4**    **Deposit**.

(a)      If this Agreement is terminated pursuant to any provision of <u>Section 8.1</u>, other than <u>Section 8.1(c)(i)</u>, then the Deposit shall be null and void and shall not serve to reduce any amounts otherwise owing to Buyer under the DIP Facility or otherwise.

(b)      If this Agreement is terminated pursuant to <u>Section 8.1(c)(i)</u> and Buyer is in material breach of this Agreement at the time of termination, then the Deposit shall be released to Sellers (and the corresponding reduction of the DIP Facility obligations effected) only upon (i) a final non-appealable judgment by the Bankruptcy Court that the Deposit should be released to Seller (and the corresponding reduction of the DIP Facility obligations effected) as the result of such termination of this Agreement by the Sellers, or (ii) a consent to release signed by Buyer.  The Parties agree that the Sellers' right to the reduction of the DIP Facility obligations contemplated by the Deposit, as set forth herein,

is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

# ARTICLE IX
# MISCELLANEOUS.

**Section 9.1     Expenses**.  Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.2     Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements.

**Section 9.3     Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4     Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.4 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.5     Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that (x) Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of

its obligations under this Agreement after any such assignment and (y) Buyer may designate rights to the Designation Rights Assets to third parties in accordance with <u>Section 2.7</u>.

       **Section 9.6**   **Notices**.     All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

      If to any Sellers, then to:

                Last Call Guarantor, LLC
                19111 Dallas Pkwy, Unit 370
                Dallas, TX 75287
                Attention: Roy Messing
                Email: Roy.messing@ankuraconsulting.com

      with a copy to:

                Greenberg Traurig, LLP
                77 W. Wacker Drive Suite 3100
                Chicago, Illinois 60601
                Attention: Nancy A. Peterman
                Email: petermann@gtlaw.com

      If to Buyer, then to:

                Fun Eats and Drinks LLC
                12730 High Bluff Drive, Suite 250
                San Diego, CA 92130
                Attention: Michael Kelly
                Email: michael@kellyinvestmentgroup.com

      with copies (which shall not constitute notice) to:

                Goldberg Kohn Ltd.
                55 E. Monroe Street, Suite 3300
                Chicago, IL 60603
                Attention: Randall L. Klein
                Email: randall.klein@goldbergkohn.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 9.6</u>.

**Section 9.7    Governing Law; Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 9.8    Consent to Service of Process**.  Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.6.

**Section 9.9    WAIVERS OF JURY TRIAL**.    EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.10    Severability**.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.11    No Third Party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.12    No Survival of Representations, Warranties and Agreements**.  None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this Article IX, and (iii) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above. Construction.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular

form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

    **Section 9.13    Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

    **Section 9.14    Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

    **Section 9.15    Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is readily apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all events subject to the Confidentiality Agreement.

**Section 9.16    Headings; Table of Contents**.   The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.17    Counterparts; Facsimile and Email Signatures**.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.18    Time of Essence**.   Time is of the essence of this Agreement.

[SIGNATURE PAGES FOLLOW]

**SIGNATURE PAGE TO**
**ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**<u>SELLERS</u>:**

LAST CALL GUARANTOR, LLC
LAST CALL HOLDING CO. I, INC.
LAST CALL HOLDING CO. II, INC.
LAST CALL OPERATING CO. I, INC.
LAST CALL OPERATING CO. II, INC.
F&H RESTAURANTS IP, INC.
CHAMPPS RESTAURANTS IP, INC.
KS LAST CALL, INC.
MD LAST CALL, INC.


By _____
    Name:
    Title:


**<u>BUYER</u>:**

FUN EATS AND DRINKS LLC


By _____
    Name:
    Title:

## **EXHIBIT A**

### **Form of Sale Order**

See attached.

**EXHIBIT B**

**Form of Bill of Sale**

To be in form and substance reasonably satisfactory to the Parties.

## **EXHIBIT C**

### **Form of Assignment and Assumption Agreement**

To be in form and substance reasonably satisfactory to the Parties.

## EXHIBIT D

### Form of Trademark Assignment Agreement

To be in form and substance reasonably satisfactory to the Parties.

## EXHIBIT E

## Form of Copyright Assignment Agreement

To be in form and substance reasonably satisfactory to the Parties.

## **EXHIBIT F**

### **Form of Domain Name Assignment Agreement**

To be in form and substance reasonably satisfactory to the Parties.

## **EXHIBIT G**

## **Form of Management Agreement**

To be in form and substance reasonably satisfactory to the Buyer and the Sellers, providing for an arrangement whereby Sellers would continue to operate certain locations until the necessary licenses can be obtained following the Closing (on terms set forth in such agreement) and under which Buyer would compensate Sellers in a fashion necessary to pay any administrative expenses created for the Sellers by virtue of providing services under such interim management agreement.

**EXHIBIT H**

**DIP Schedule**

See attached.

# **EXHIBIT I**

## **Form of Applicable Promissory Note**

See attached.

## SCHEDULE 2.3

## Assumed Liabilities

The following items shall each be treated as Assumed Liabilities of the Buyer, except in each case to the extent that Buyer has caused such amounts to be funded under the DIP Agreement (*and, in each case, the amounts to be paid under the DIP Facility and/or as Assumed Liabilities by Buyer shall not, in the aggregate for the items listed as "Accrued/Assumed" on the DIP Schedule, exceed the total amounts scheduled in the aggregate for such items on the DIP Schedule through the End Date*).

1.    Liabilities under the Assumed Contracts (including Cure Amounts) and the Assumed Permits.

2.    Trade payables of Sellers that were (x) incurred after the Petition Date and (y) not yet due and payable (other than those owing for professional services to retained professionals in the Chapter 11 Cases).

3.    All employee related liabilities for Current Employees that are post-petition Administrative Claims. Furthermore, Buyer shall not have a requirement to assume or fund any amounts for this category to the extent such items do not represent administrative claims (including severance amounts, bonus amounts, or otherwise).

4.    Subject to Section 8.1(g), the 503(b)(9) Claims set forth on the DIP Schedule to the extent allowed by the Bankruptcy Court; and provided that such amounts may be paid other than in a lump-sum to the extent so agreed with the applicable claimants.

5.    Claims for post-petition stub-rent under Leases that are Excluded Contracts pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (a) 10 days following Closing and (b) the last day of the month in which the Closing occurs).

6.    Claims for post-petition stub-rent under Leases that are Designation Rights Assets and are designated as rejected during the Designation Rights Period, pursuant to section 503(b) of the Bankruptcy Code).

7.    Payroll taxes of Sellers to the extent related to periods after the Petition Date. Buyer shall not have a requirement to assume or fund any amounts for this category to the extent such items do not represent or relate to administrative claims.

8.    Sales taxes and other administrative taxes of Sellers to the extent related to periods after the Petition Date.

9.    Gift card obligations of the Sellers as described on Section 6.14.

10.    Any administrative expenses that Buyer has expressly agreed to pay pursuant to the last sentence of Section 2.1 or in the proviso of the second sentence of Section 2.6(a).